UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| BRIGHT HARVEST SWEET POTATO COMPANY, INC., | Case No. 1:13-cv-296-BLW |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| H.J. HEINZ COMPANY, L.P., | |
| Defendant. | |

## INTRODUCTION

The Court has before it two motions in limine filed by Plaintiff Bright Harvest

Sweet Potato Company, Inc. (Dkts. 87, 88) and two motions in limine filed by Defendant

H.J. Heinz Company (Dkts. 69, 70). The Court will address each motion below. The

Court recognizes other motions are pending, but will defer ruling until further briefing

has been received and reviewed.

## ANALYSIS

**1. Plaintiff's Third Motion in Limine Re: Advice of Counsel.**

Bright Harvest moves to exclude evidence that Heinz relied upon the advice of

counsel when it stopped ordering sweet potato fries from Bright Harvest. (Dkt. 87). In

support of its motion, Bright Harvest alleges Heinz refused to provide attorney-client

communications between its employees and counsel who negotiated the Co-Pack

Agreement ("CPA"). Given such refusal, Bright Harvest requests the Court preclude Heinz from using these communications to explain what Heinz intended or understood the CPA language to mean. Additionally, Bright Harvest moves to preclude Heinz from using attorney-client communications to show that Heinz's breach of the CPA did not constitute willful misconduct or gross negligence. Specifically, Heinz wants to introduce (1) testimony from Jonathan Bailey, (2) Exhibit 2019, and (3) Exhibit 2122.

Heinz seeks to show its intent when it entered into the CPA by introducing Exhibit 2019. That exhibit is a string of e-mails between Heinz's employees and legal counsel written prior to the signing of the CPA. Heinz asserts that it disclosed this exhibit to Bright Harvest when Tim Hensley forwarded the string of e-mails to Rex King. However, during Daniel Shaw's deposition, Heinz's counsel indicated that the e-mails were privileged communications and that Hensley did not waive that privilege when he improperly disclosed the e-mails. *See Dep. of Daniel Shaw 46:25 – 49:7*, Ex. D, *Nicholson Decl.*, Dkt. 108.

Heinz now seeks to introduce the e-mails it previously claimed were privileged and elicit testimony of the related conversations with counsel. Heinz may not use the attorney-client privilege as both a sword and a shield. *See In re Fresh and Process Potatoes Antitrust Litig.*, 2014 WL 1413676, at*5 (D. Idaho 2014). A party may not selectively reveal only those portions of the privileged communications most beneficial to its case. *See id.* Accordingly, the Court will grant this portion of Bright Harvest's

motion and preclude Heinz from using attorney-client privileged communications to explain what it intended or understood the CPA language to mean.

Heinz also seeks to elicit testimony from Jonathan Bailey, who was involved in the decision to stop purchasing product from Bright Harvest in September 2012. Additionally, Heinz might introduce Exhibit 2122 to illustrate its legal counsel's position on Heinz's ability to stop purchasing product under the CPA. Exhibit 2122 is a string of e-mails between Heinz's employees discussing legal counsel's opinion of whether certain actions would breach the CPA.

During Hensley's deposition, Heinz instructed Hensley not to answer questions regarding legal advice he received about Heinz's ability to stop purchasing under the CPA. *See Hensley Dep.* at 218:1-219:11, Ex. D, *Nicholson Decl.*, Dkt. 108. Likewise, during Kris Ketola's deposition, Heinz objected to conversations with in-house attorney Leslie Britton about Heinz's exit strategy. *Ketola Dep.* at 97:1-98:17, Ex. D, *Nicholson Decl.*, Dkt. 108. Also, during his deposition, Bailey testified that he e-mailed Britton about whether Heinz could self-produce sweet potato fries. *See Def.'s Opp'n* at 3, Dkt. 98. During discovery, Heinz claimed privilege and did not produce these e-mails in discovery. *See Nicholson Decl.*, Exh. E, Dkt. 108-1. Despite the fact that Heinz claimed privilege in these communications, it now seeks to introduce Exhibit 2122—a thread of e-mails between Bailey, Hensley, and Ketola discussing the privileged communications previously objected to by Heinz.

Heinz again attempts to use attorney-client privilege as both a shield and a sword. It objected to questions during depositions about exit strategy with legal counsel and now seeks to introduce such evidence at trial. Also, it asserted privilege as to e-mails with Britton but seeks to introduce the content of those e-mails through other means. Heinz cannot selectively choose to produce only certain privileged communications. Moreover, Heinz cannot deprive Bright Harvest of the opportunity to cross-examine deponents about evidence that Heinz intends to present at trial. *See, e.g., In re Fresh and Process Potatoes Antitrust Litig.*, 2014 WL 1413676, at*5. Accordingly, the Court will grant Bright Harvest's motion and preclude Heinz from using attorney-client communications to show its state of mind when it exited the contract.

## 2. Defendant's First Motion in Limine Re: Damages.

### a. Other Damages

Heinz asks the Court to preclude Bright Harvest from seeking damages relating to: 1) loss of goodwill with raw potato suppliers, (2) loss of goodwill with Arkansas Capital and Simmons First Bank, (3) loss of industry reputation, and (4) loss of critical skill work force. (Dkt. 69). Bright Harvest does not seek to recover these items at trial. Accordingly, the Court grants this request. The Court will not, however, exclude evidence simply because it may incidentally relate to one of these categories. Any disputes regarding such evidence will be resolved at sidebar during trial.

### b. Evidence Relating to Lost Profits

Heinz seeks to preclude Bright Harvest from presenting evidence of "lost profits." (Dkt. 69). Heinz asserts that Section 16(e) of the CPA bars Bright Harvest from recovering lost profits. That section states:

> Neither [Bright Harvest] nor Heinz shall be responsible or liable for the lost profits of the other party in case of a breach of this Agreement, unless the party breaching this Agreement has caused such lost profits due to its willful misconduct or gross negligence.

*Am. Compl.*, Ex. A, Dkt. 11-1, at 11.

Bright Harvest contends that this language only applies when a party seeks lost profits in connection with a claim for indemnification. Heinz, in contrast, contends that the language applies to the entire agreement. It is for the Court to decide whether the terms of a contract are ambiguous as a matter of law. *Carpenters Pension Trust Fund v. Underground Constr. Co.*, 31 F.3d 776, 778 (9th Cir. 1994). However, a disagreement about a contract's meaning does not necessarily render the contract ambiguous. *Int'l Union of Bricklayers & Allied Craftsman Local No. 20 v. Martin Jaska, Inc.*, 752 F.2d 1401, 1406 (9th Cir. 1985). To be ambiguous, the terms of the contract must be susceptible to two different and reasonable interpretations—each being consistent with the language of the contract as a whole. *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989) (citation omitted). "If a contract's terms are clear and unambiguous, the contract's meaning and legal effect are questions of law to be

determined from the plain meaning of its own words." *Bream v. Benscoter*, 79 P.3d 723 (2003).

Although Section 16(e) is located within the indemnity section of the CPA, the only reasonable interpretation of this provision is that it applies to the entire CPA. The term "Agreement," as used throughout the CPA, refers to the CPA as a whole. Section 16(e) explicitly states that neither party is responsible for lost profits "in case of a breach of this Agreement." *Am. Compl.*, Ex. A, Dkt. 11-1, at 11. It is unreasonable to limit application of this language to only instances when a party seeks lost profits in connection with indemnification. Thus, Section 16(e) applies to both indemnification and non-indemnification provisions. Accordingly, to recover lost profits, the plain language of the Agreement requires that Bright Harvest show Heinz breached the Agreement and caused lost profits due to Heinz's willful misconduct or gross negligence.

### c. Evidence Relating to Reasonable Overhead

Additionally, the parties disagree as to whether the term "profits" includes reasonable overhead. The Court's role in interpreting a contract is to effectuate the mutual intent of the contracting parties. *Straub v. Smith*, 175 P.3d 754, 758 (Idaho 2007). A court should first look to the four corners of the contract to ascertain the intent of the contracting parties. *See id.* If the contract's language is clear and unambiguous on its face, the intent of the parties is most readily ascertained from simply reading the contract. *Id.*

The Agreement does not define "profits." It is unclear from Section 16(e) alone whether the term "profits" refers to gross profits or net profits. Net profits, unlike gross

profits, are adjusted for additional expenses, such as reasonable overhead. *See* BLACK'S LAW DICTIONARY (10th ed. 2014). Heinz contends that, by definition, the term "profits" includes reasonable overhead. (Dkt. 88-1, at 7). It is true that the U.C.C., as adopted in Idaho, authorizes the recovery of "profit (including reasonable overhead)" when damages are inadequate to put the seller in as good a position as performance would have done. *See* IDAHO CODE ANN. § 28-2-708 (2015). However, this does not mean that whenever parties refer to "lost profits" in drafting their contract, they necessarily include reasonable overhead. The statute simply authorizes an award of profits and reasonable overhead, i.e. gross profits, when damages are otherwise inadequate. It does not dictate that "lost profits" always includes reasonable overhead. This much is made clear by the fact that the CPA references "lost profits," not "profits (including reasonable overhead)."

Each section of the CPA must be interpreted with reference to the whole contract and not in isolation. *See Kennewick Irrigation Dist.,* 880 F.2d at 1032. A court should construe a contract in a manner that gives full meaning and effect to all its provisions and avoid an interpretation that renders part of the contract meaningless or unreasonable. *Id.* The Purchase Order, as explicitly incorporated into the signed CPA, separately mentions overhead and profits. *King Decl.*, Ex. E, Dkt. 47-3, at 73. To hold that the term "profits" includes overhead would make language in the Purchase Order superfluous. Thus, in order to give meaning to each word as used in the contract, the term "profit" in Section 16(e) does not include overhead. Accordingly, at trial, Bright Harvest is not required to show that Heinz caused lost overhead due to willful misconduct or gross negligence.

### d. Evidence of Willful Misconduct or Gross Negligence

Heinz seeks to exclude evidence of lost profits because Bright Harvest failed to allege willful misconduct or gross negligence in its amended complaint. (Dkt. 69). Heinz maintains that Bright Harvest did not argue these theories until Bright Harvest responded to Heinz's Motion for Summary Judgment. *Id.* at 8.

In its amended complaint, Bright Harvest alleges that it "suffered damages including lost profit." *Am. Compl.* at 5, Dkt. 10. Bright Harvest's allegation must be "a short and plain statement of the claim" that shows it is entitled to relief. *See* FED. R. CIV. P. 8(a)(2) (2015). Such a statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47 (1957). "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002).

The Court finds that Heinz had fair notice of Bright Harvest's claim. The unambiguous language of the CPA notifies both parties that lost profits may only be recovered by showing that the other party breached the CPA through their willful misconduct or gross negligence. As a result, Heinz was aware that Bright Harvest would be resting its claim for lost profits on those grounds. Accordingly, Bright Harvest is entitled to present evidence to support its claims.

The Court has another concern with Heinz's motion; it is essentially a motion for summary judgment, not a motion in limine. *See, e.g., Fort Hall Landowners Alliance, Inc. v. Bureau of Indian Affairs*, No. CV-99-52-E-BLW, 2007 WL 2187256, at *1 (D. Idaho July 16, 2007) (rejecting a motion in limine because it sought a ruling as a matter of law). Heinz asks the Court to weigh evidence regarding willful misconduct and gross negligence. The deadline for dispositive motions has passed. As such, the Court will deny this portion of Heinz's motion.

### e. King and Baker

Heinz requests the Court preclude King and Baker from testifying as expert witnesses. (Dkt. 69). Bright Harvest seeks to elicit testimony of damages from King and Baker, but never disclosed King or Baker as expert witnesses. Bright Harvest contends that if King and Baker's testimonies are considered expert opinion testimony, it has adequately disclosed these testimonies.

Rule 26(a)(2)(B) requires a party to provide a written report identifying the expert witness and listing details of anticipated testimony. However, the report is needed only for witnesses "retained or specially employed to provide expert testimony in the case" or "whose duties as the party's employee regularly involve giving expert testimony." FED. R. CIV. P. 26(a)(2)(B). King and Baker are outside the scope of this rule because they work as the President and Chief Financial Officer for Bright Harvest. Thus, Bright Harvest was not required to file a detailed written report under Rule 26(a)(2)(B).

On the other hand, if Bright Harvest wants King and Baker to offer opinion testimony under Rule 702, 703, or 705, they must still provide opposing counsel with the more limited disclosure required by Federal Rule of Civil Procedure 26(a)(2)(C). That Rule provides:

> *Witnesses Who Do Not Provide a Written Report.* Unless otherwise stipulated or ordered by the court, if the witness is not required to provide a written report, this disclosure must state:
>
> (i)  the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and
>
> (ii)  a summary of the facts and opinions to which the witness is expected to testify.

FED. R. CIV. P. 26(a)(2)(C).

Bright Harvest claims it made this disclosure "in document form as well as deposition testimony." *Pl.'s Opp'n* at 10-11, Dkt. 101. However, this alleged disclosure did not take place prior to the February 17, 2014 deadline set forth in the Case Management Order. Additionally, Bright Harvest failed to identify the subject matter of the opinion testimony that King and Baker were expected to offer. Moreover, Bright Harvest did not even disclose that King and Baker may be testifying under Rules 702, 703, or 705, as required by Rule 26(a)(2)(a). Accordingly, they will not be allowed to offer opinion testimony under Rules 702, 703 or 705.

On the other hand, there is no disclosure requirement for witnesses who will offer lay opinion testimony. Baker and King may therefore provide lay witness testimony, in the form of an opinion, but it must be "(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." FED. R. EVID. 701.

Heinz argues that King and Baker's testimonies regarding damages invade expert witness testimony. Specifically, Heinz seeks to preclude King and Baker from testifying about lost profits and overhead absorption, reasoning that such testimony is limited to expert witnesses. But a lay witness may express an opinion on matters normally reserved for expert testimony if the witness has particularized knowledge of the facts that form his opinion and has a "rational connection to those facts." *Miss. Chem. Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 373 (5th Cir. 2002). Indeed, "[t]he modern trend favors the admission of [lay] opinion testimony, provided that it is well founded on personal knowledge and susceptible to specific cross-examination." *Teen-Ed, Inc. v. Kimball Int'l Inc.*, 620 F.2d 399, 403 (3rd Cir. 1980). As such, a lay witness may testify about lost profits and overhead absorption if he has personal and "direct knowledge of the business accounts underlying the profit calculation." *Miss. Chem. Corp.*, 287 F.3d at 373.

For instance, in *Miss. Chem. Corp.*, the Fifth Circuit allowed a company director of risk management and property taxation to testify as a lay witness about lost profits because he had personal knowledge of the company's books, since "he had previously done lost profits calculations" for the company. *Id.* at 374. Thus, the director "had sufficient knowledge of [the company's] underlying business accounts to testify under Rule 701 about lost profits." *Id.* That court also noted that opposing counsel had the

opportunity to challenge the lay witness's credibility, methodology, and how he arrived at figures. *Id.*

This Court recognizes that the Ninth Circuit has not yet embraced or rejected the trend of permitting lay testimony regarding damages. However, district courts within the Ninth Circuit have followed the trend. *See, e.g., Google AdWords Litig.*, No. 5:08-CV-3369 EJD, 2012 WL 28068, at *4 (N.D. Cal. Jan. 5, 2012) ("The rules of evidence have long permitted a person to testify to opinions about their own business based on their personal knowledge of that business. . . . The Court does not believe [that] Rule 701 [was] intended to exclude that form of personal testimony.") (internal quotation omitted). *See also Adams v. United States*, 2009 WL 1532282 at *1 (D. Idaho 2009) (noting that a business owner may testify to the projected profits of the business based on the "particularized knowledge that the witness has by virtue of his or her position in the business") (citing Advisory Committee Notes To 2000 Amendments); *Montalvo v. Am. Family Mut. Ins. Co.*, No. CV-12-02297-PHX-JAT, 2014 WL 2986678, at *5 (D. Ariz. July 2, 2014) (observing that "lay witnesses may testify to particularized knowledge by virtue of [their] experience[s] even if the subject matter is specialized or technical[,] because the testimony is based upon the layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702") (internal quotations omitted); *Hammann v. 800 Ideas Inc.*, No. 2:08-CV-0886-LDG-GWF, 2014 WL 1089664, at *2 (D. Nev. Mar. 18, 2014) (ruling that "the law does not prohibit lay witnesses from testifying based on particularized knowledge gained from their own experience").

Here, King is the President of Bright Harvest and Baker is the Chief Financial Officer. Bright Harvest intends for King and Baker to testify about damages using their personal knowledge of the company and personal experience preparing various financial documents. Given King and Baker's positions and their experiences in developing financial calculations for the company, they may testify about lost profits to the extent that they have personal and particularized knowledge of the facts that form their opinions. They may testify to financial documents they prepared for Bright Harvest, such as balance sheets or profit and loss summaries. King and Baker may also testify as to how they reached calculations in those financial documents. However, they may not testify beyond their personal opinion and personal experience. Furthermore, Heinz will have the opportunity to cross-examine King and Baker about their credibility, methodology, and how they arrived at various figures.

For the reasons set forth above, the Court grants Heinz's motion to exclude King and Baker from testifying as expert witnesses, but denies the motion to the extent that King and Baker may testify about damages as lay witnesses. During trial, the Court will revisit any concerns about the scope of their testimony outside the presence of the jury.

3. **Plaintiff's Fourth Motion in Limine Re: Exclusion of Witnesses.**

    a. **Dennis Reinstein and Rick Moran**

Bright Harvest seeks exclusion of testimony from expert witnesses Dennis Reinstein and Rick Moran. (Dkt. 88). Heinz states that it will not call either Reinstein or Moran at trial. Accordingly, the Court grants this request.

### b. Kenneth Hooper

Bright Harvest requests that the Court exclude expert testimony from Kenneth Hooper. (Dkt. 88). Heinz seeks to admit Hooper's expert testimony as rebuttal to King and Baker's testimony regarding damages. However, Heinz did not provide a timely expert report to Bright Harvest.

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). Here, Heinz bears the burden to prove it had "substantial justification" for the late filing or that the late filing was harmless. *See Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001).

Heinz contends that the late filing was "within the spirit of the Court's Case Management Order," even though it disclosed Hooper almost a full year after the Court's deadline for expert witness disclosures. *Def.'s Br.* at 19, Dkt. 69-1. Here, the failure to identify Hooper before February 2015 was not substantially justified because the disclosure came almost 10 months after Heinz learned about Bright Harvest's damages calculations. Such a late filing is harmful because Bright Harvest, so close to trial, has little or no time to depose Hooper. Indeed, Heinz provided the expert report only one month prior to trial, when the parties were engaged in final trial preparation. Additionally, if Hooper is allowed to testify, Bright Harvest may need to find a damages expert to rebut Hooper's testimony. The fact that Heinz offered to take Hooper's

deposition cannot cure this harm. Accordingly, the Court will grant the motion to exclude

Hooper from testifying as an expert witness.

**4.  Defendant's Second Motion in Limine Re: the May 3, 2011 Settlement Agreement.**

**a. Breach**

Heinz requests that the Court prohibit Bright Harvest from introducing evidence

that Heinz breached the CPA before April 25, 2011. (Dkt. 70). The Settlement

Agreement indeed bars claims of breach before that date. However, evidence of

documents, statements, and actions that occurred prior to April 25, 2011 may be relevant

for another purpose. At this point, the Court is unable to rule on the admissibility of such

evidence. Heinz has not adequately described the evidence it wishes to exclude.  Without

such a description, the Court cannot make an informed ruling. As such, the Court will

reserve ruling on the motion until trial. The parties have both stated they will not claim a

breach occurred prior to April 25, 2011. To the extent that Bright Harvest seeks to

introduce evidence of Heinz's actions and statements for another purpose, it should be

prepared to show why such evidence is otherwise admissible.  The Court will resolve any

dispute on this issue outside the presence of the jury.

**b. Equitable and/or Promissory Estoppel**

Heinz further requests the Court preclude Bright Harvest from introducing

evidence in support of its claims for equitable and/or promissory estoppel. For reasons

explained below, the Court permits Bright Harvest to introduce evidence of statements,

actions, and documents made before April 25, 2011 to support a claim of equitable and/or

promissory estoppel that arose after April 25, 2011. The Court therefore denies Heinz's

motion to exclude such evidence.

A promissory estoppel claim requires the following elements: reasonable reliance

on a promise, detriment suffered from that reliance, and substantial loss in reliance that

was or should have been foreseen by the promisor. *Gillespie v. Mountain Park Estates,*

*L.L.C.*, 56 P.3d 1277, 1279 (Idaho 2002). These elements do not suggest that a release of

pre-existing liability, before a party suffers detriment, necessarily bars a promissory

estoppel claim. On the one hand, a fully developed promissory estoppel claim would

have been barred by the general release of claims made in the Settlement Agreement.

However, the Court cannot rule, as a matter of law, that statements and representations

made prior to the execution of the Settlement Agreement are not relevant to promissory

estoppel claims based upon promises, detriment and/or reliance that occurred after it was

signed by the parties.

Likewise, the equitable estoppel doctrine is "based on the concept that it would be

inequitable to allow a person to induce reliance by taking a certain position and,

thereafter, take an inconsistent position when it becomes advantageous to do so."

*Regjovich v. First W. Invs., Inc.*, 997 P.2d 615, 619 (Idaho 2000). In the present case,

Bright Harvest's equitable estoppel claim may require it to prove that Heinz's position

after the Settlement Agreement was inconsistent with Heinz's position before the

Settlement Agreement. To do so, the Court may permit Bright Harvest to introduce

evidence of statements, actions, and documents made before the Settlement Agreement.

The Court therefore denies Heinz's request to exclude evidence of equitable and/or promissory estoppel.

However, the Court will not allow Bright Harvest to introduce such evidence to demonstrate a breach occurred before April 25, 2011, while disguising the evidence as support for claims of equitable or promissory estoppel.

### c. Forecasts

Heinz also requests the Court preclude Bright Harvest from introducing evidence that contradicts the forecast attached to the Settlement Agreement, as well as the forecasts provided in July and August of 2011, because Heinz purchased the product amounts set forth in those forecasts. To support its position, Heinz focuses on the Settlement Agreement language that provides "Heinz is under no obligation to commit any volume to Bright Harvest, except as set forth in Exhibit A and any 5 weeks of firm production orders as set forth in any subsequent electronic rolling weekly demand files submitted to Bright Harvest*." Gardner Aff*., Ex. B, Dkt. 45-5, at 1. However, the Settlement Agreement also reads, "…this mutual release does not discharge or alter the duties and obligations of the parties under the Agreement or Related Agreements…" *Id.* at 2. Thus, simply because Heinz purchased the product amounts set forth in the forecasts does not necessarily mean that Heinz complied with its duties and obligations under the CPA.

At trial, Heinz is free to introduce evidence that it purchased the amounts set forth in the forecasts and that it was under no obligation for future production orders with Bright Harvest. In the same vein, Bright Harvest may introduce evidence to demonstrate

that Heinz failed to purchase the forecasted amounts or that the Settlement Agreement did not modify Heinz's already existing duties and obligations. Ultimately, it is the exclusive province of the jury to weigh the evidence.

In light of the Settlement Agreement and the forecasts, Heinz argues it would be unreasonable for Bright Harvest to rely on evidence that Heinz led Bright Harvest to believe there might be purchase orders beyond September 2012. This is an argument that is more properly suited for the summary judgment stage, rather than a motion in limine. The deadline for dispositive motions has passed. It is now for the jury to determine what may or may not have been reasonable reliance. Accordingly, this portion of Heinz's motion is denied.

### d. Implied Covenant of Good Faith and Fair Dealing

Heinz further requests the Court deny Bright Harvest's claim alleging breach of the implied covenant of good faith and fair dealing because the covenant may not override or contradict an express term of an agreement. Heinz again refers to the Settlement Agreement and attached forecast, as well as the July 2011 forecast, to support its contention. The Settlement Agreement explicitly states:

> Each party's respective obligations and duties under the [Co-Pack] Agreements … shall continue on and after the Effective Date and this mutual release does not discharge or alter the duties and obligations of the parties under the Agreement or Related Agreements but releases any breach of such agreements to the extent arising prior to the Effective Date.

*Gardner Aff.*, Ex. B, Dkt. 45-5, at 2.

Therefore, any covenant of good faith and fair dealing that was in effect prior to the May 3 Settlement Letter was still in effect after May 3. Accordingly, Bright Harvest is entitled to introduce evidence that contradicts the forecasts and may likewise argue that Heinz breached the covenant of good faith and fair dealing. Similarly, Heinz may introduce evidence that demonstrates it did not breach the implied covenant of good faith and fair dealing. The Court will not, on a motion in limine, preclude a party from introducing all evidence of their claim. Such an action would be tantamount to dismissal, which is inappropriate at this time.

## ORDER

**IT IS ORDERED:**

1.    Plaintiff's Third Motion in Limine (Dkt. 87) is GRANTED.

2.    Defendant's First Motion in Limine (Dkt. 69) is GRANTED in part and DENIED in part.

3.    Plaintiff's Fourth Motion in Limine (Dkt. 88) is GRANTED.

4.    Defendant's Second Motion in Limine (Dkt. 70) is DENIED in part, and RESERVED in part.

DATED: March 9, 2015

B. Lynn Winmill
Chief Judge
United States District Court